Good morning, Your Honors. My name is Lawrence Jeffrey Lichter, and I'm here representing Marion Frye, M.D. In a matter where the DEA, the Drug Enforcement Administration, junior administrator, Mr. Brown, Jr., served as an administrative law judge and revoked her right to prescribe medication without a hearing. One of the earliest things that I was taught, and I'm from Fox Point, Wisconsin, to the extent that that matters. I'm from Fox Point, Wisconsin. I'm not a native Californian, nor am I from Nebraska. So I'm a country boy from California that I represent, from cool California. And Ms. Frye was aware that there was going to be some kind of procedure coming down the pike. She was aware that she was being investigated. People who were associated with her husband's business were arrested. Not that she had any part of it, or even understood much of it, but she knew something was going to happen. And she did get a notice from the Drug Enforcement Administration, under Assistant Mr. Brown, III, that they were going to have a challenge of her right to continue to write prescriptions. Something very important, because if a doctor cannot prescribe penicillin, cannot prescribe appropriate medication. Did it cover penicillin? In fact, Dr. Frye is right now forbidden from writing prescriptions for penicillin, although she shouldn't be, technically. It isn't the Schedule II through V drug, which is really what's at stake at the hearing officer's one-sided opinion. In any case, she received the notice. When you say the notice, you're talking about the order to show cause. The order to show cause. And the form that was attached to it. And the form that Ms. Nagel had attached to it. Right. What could be simpler? Right. You know, she's told, three things can happen. You can request a hearing, and in which case, we will set a date for a hearing. And you can be represented, and you have certain rights. Secondly, you can decide that there's no reason for a hearing, and you can let us know that you do not want a hearing. In which case, the under-assistant, Mr. Brown III, will make his decision without hearing any other side of the story. And third, if they don't hear anything, they will take that to mean, they will deem, that she has made a waiver. And a waiver is normally considered, in the law, in our state courts, I know we call it, knowing and intelligent. Something that you know you have, and you make a decision not to take advantage of. Not something that, you can't smoke what you don't have, you can't lose what you may never have. What happened in this case is particularly unfortunate, because she had an attorney. And you folks know that she had an attorney who was involved in this, because he was involved in a case where Dr. Frye's husband, Mr. Schaefer, was trying to get marijuana back, that had been seized by the authorities. And I believe, on October 5th, and I've given the clerk notice of this, because it's not really a related case, doesn't have much to do with our situation, but he was trying to get back marijuana, which was the very subject of the charges against Ms. Frye. Mr. Nix told Ms. Frye, as her attorney, thank you for giving me a copy of this order to show cause. I will, of course, do what's appropriate and make sure that you have a hearing where you can defend yourself. And that was the last that Dr. Frye heard about it from Mr. Nix or from the Drug Enforcement Administration. In the meantime, Mr. Nix was trying to get the medicine returned, as he saw fit, and was even in the Ninth Circuit, in case number 01-17299. Nothing was heard from the DEA. Dr. Frye was concerned about it, so concerned about it, that she felt that perhaps Mr. Nix had a conflict of interest representing her husband, and she came to our office and asked us to represent her at the hearing, when it was finally set by the Drug Enforcement Administration's Administrative Law Court. I personally consented to take that job. However, the next communication received from the DEA was this long decision saying, number one, she has waived her right to a hearing. Number two, everything in this file that I was given by the government is true. And lastly, I'm going to find that it's not in the public interest for her to continue to prescribe medication to her patients, because she was too associated with this marijuana. And lastly, that I'm doing all this, although I'm not violating the law, which, as of today, I don't think the Supreme Court has granted certiorari on Conant v. McCafferty. And that's a decision that the Court made. It made arrangements to have it published in the Federal Register and sent it to Dr. Frye, where it landed like a bomb in Dr. Frye's lap. Here she had an attorney who was agreed to do the hearing, who was gathering evidence. Here she had no idea that there might be some question of whether Mr. Nick had formally asked for an attorney. This was a shock to her. I personally was in jury trial, but I'm lucky. I work with other good, responsible people. And Ms. Ruiz immediately contacted the Drug Enforcement Administration under Assistant Administrative Law Judge and said, there's been a misunderstanding. She does want the hearing. Her lawyer told her she had requested the hearing. Where's the harm or foul? It's obviously good cause under the statute that something happened and it took the cup and the lip. You know, we don't have to imply that the post office is always perfect or always terrible, but something had happened. Dr. Frye always wanted this hearing, and Ms. Ruiz contacted Mr. Brown III and was not treated as an attorney. That's the way we expect to be treated, frankly, when we contact people who are public servants. Their job is to protect the public. So then, of course, comes the frantic search to find in Mr. Nick's computer, in his mother's computer, in his girlfriend's computer, a copy of the letter. Because we didn't have a certification. We had Mr. Nick's word that he had, indeed, gotten the order of show cause from Dr. Frye and had acted upon it appropriately within the time limits. It did not appear to be forthcoming, at which point both Ned Ruiz and I, as the new attorney, wrote a letter to Mr. Brown Jr. saying, hey, you don't want to take this woman's right. She's a doctor, and she's a good doctor, and she's never been in any trouble, and she works hard to be a doctor, and she cares about her patients, and she's in a rural community where we need doctors. Clearly, we would like to contest these allegations that are very bold and bare and many anonymous at that point. So please reconsider your final order enough to at least, at least, give her a little due process and have a hearing. We were shocked when on the 17th we got a reply from Mr. Brown Jr. saying no, saying, I don't have enough evidence that the lawyer really applied for a hearing. Essentially, that's what he says. Then he goes on to say, besides, I think what Dr. Frye is doing is bad for the community. And also this thing, we did try to raise other grounds in hopes that he might respond to one of them, and I find this ground inconsistent with that ground. Essentially, we got an extremely unsympathetic year, which caused us to do something we don't like to do in every little situation with administrative hearing, and that is prepare a petition to this august court. However, that's what Ms. Ruiz did, and she filed the petition. She also went to Mr. Nick and said if you can't give us something from the computer, at least tell us the truth under oath so we can submit it to these hearing officers in this court to show that the victim here is Dr. Frye. She's the one who's being knocked out of the box without a hearing, and thus it appears without good cause, and she has good cause to reopen. And so Mr. Nick does come through with a declaration under penalty of perjury, and of course that gets to us, I believe, shortly after Mr. Ruiz files the petition with this court, really challenging everything. I understand the way Mr. Quinlivan writes it, and, you know, he does all the medical marijuana attacks in California. He says, well, maybe you're within the time limits because you did ask her to reopen the hearing based on primarily the fact that she had intended to get a hearing in the first place, but then you're limited to whether she gets a hearing in the first place. But the way we count it, she might be a day late, too, in this matter. You know, Mr. Nick may have been six months late, but she might have been a day late, and takes the easy route to deprive Dr. Frye of some very, very, very precious rights. In fact, goes so far as to say this is the perfect case and this is the perfect court to find the administrative law timing provisions jurisdictional right here and just throw us out. Let's talk about that. Isn't it jurisdictional? Well, it has not been ruled jurisdictional in this court, number one. Several other courts have said it's jurisdictional. Well, they've said it in equivalent administrative situations. But Mr. Quinlivan does leave us an out. He says you could, in his opinion, start counting not from the day that the Federal Register published the calumny against Dr. Frye, but start counting from the day that the hearing officer denied her written request to reopen the hearing based on the fact that, in fact, she did want such a hearing and had always expected she would get one. Now, what's the authority for that? The government's lawyer's representation? No, I think it's a reasonable interpretation. Interpretation of what? A statute, a regulation? Well, you know, one of the hard parts of coming in this kind of a situation is that you come with vague principles, like the law abhors a default. Why does the law abhor a default? Sometimes defaults are very efficient and get to the right result. We abhor it because it ain't fair. And because that's really the one thing that everybody in this room associated with the profession, including yourselves, is supposed to be concerned about, what's fair? And as soon as Ms. Ruiz discovered that Mr. Nick's request for a hearing was not acknowledged or never received, whatever it was, she attempted to find good cause to reopen the hearing. And what could be a better cause than just being shut out? And that, there is authority. Would you like me to find it just a second, Your Honor? Well, I'm just, you know. 12 CFR 1301.43, parentheses D. Does a federal agency have inherent authority to reconsider its own decision? Inherent authority? Yeah. I don't believe that every federal agency has the same flexibility. But my understanding is that this would be controlled by 12 CFR 1301.43, parentheses D, where for good cause they can reconsider. And, you know, there's a question of whether something's a new argument or new evidence or new in what way. Well, it should be significant to the hearing officer that this person was not making a knowing waiver, that this person was a victim of their attorney. To me, that's good cause. It's a vague concept, but I'm hoping that it's good cause. The declaration that you offered to us, Mr. Hicks, Nick's declaration, was never presented to the agency, was it? Didn't. We had trouble getting it in time because we had great hope we could find the original letter that was made within the 30 days. And Mr. Nick cooperated with that. He got us the statement under penalty of perjury, which we took only as a last resort as soon as he was able to get it to us. But that had been represented to the hearing officer in the letter and personally prior to that. He didn't keep a file on this case. Who didn't? First lawyer. Mr. Nick? Yeah. I have gone through his file. It appears to be majority the case I cited to you where he's trying to get back the marijuana on behalf of Mr. Schaefer. If I was Molly's case, I don't think he ever committed himself to doing the hearing. I don't think Molly wanted him to do the hearing. There was a feeling there might have been a conflict of interest since Mr. Schaefer is an important witness on Dr. Fry's behalf. He didn't open up a file on the doctor. I believe he was limited to preserving her rights and getting her the hearing, and then she approached me to actually conduct the hearing. So as a result, whatever file he had was inadequate, and having personally been involved with the computer searches, I didn't see any such file in the computer. He didn't have a file. That's how it appears to me. How about the copy she gave him? Did she give him a copy of this for an initial cause? Yes, she did. Does he have that? We weren't able to find his copy of it. He was pretty equivocal about whether he had ever done anything to seem to be on this. I think that he saw his role, and we filed a brief with this court on June 5, 2002. I think he felt that he would protect Molly's rights, but that he would be Mr. Schaefer's attorney and that Molly would have a separate attorney, that Dr. Fry would have a separate attorney. And I think he was right about that after learning something about the case, and I'm the one who would be Dr. Fry's attorney, and I'm here because I haven't had my day in court. May I save a little bit for rebuttal? Sure. Of course, I'll answer any questions you have. Okay. May it please the Court, Mark Quinlivan of the United States Department of Justice on behalf of the Drug Enforcement Administration. I'd like to make three brief points this morning. Do you do these cases all over the country? I litigate all over the country, not necessarily these cases. Our office litigates all different sorts of constitutional challenges to federal statutes. Do you handle all these marijuana cases? I handle the civil marijuana cases in California, yes. I also handle cases challenging Eleventh Amendment immunity of states, any number. These are not the only cases that I handle. Dr. Fry's petition for review, both from the final order revoking her registration and from the denial of her request to reopen, it is clear that this Court has jurisdiction only to consider the latter. The statute which vests this Court with jurisdiction, 21 U.S.C. Section 877, provides that within 30 days after notice is provided, one must request a hearing from the DEA. In this case, the final order revoking Dr. Fry's registration was rendered on December 13, 2002, and it was published in the Federal Register on December 20. If someone is out of the country and they get one of these orderly show causes, they're in Africa taking care of people with AIDS. They don't come back for too long. What happens then? Well, I think that if that individual's attorney also does not receive it, there may be an instance in which the attorney becomes aware of it. The individual doesn't have an attorney. Well, then in that instance... He goes off and they get this orderly show cause through the mail, and they can't be reached with a boondock someplace. That individual... They come back after two months, and oh, my God. Then that individual could file or request the DEA administrator to reopen the proceedings as Dr. Fry did here. But it wouldn't be final at that point, would it? It would be. It's final when it's published in the Federal Register. Well, but assuming Judge Pregerson's question, the person comes back after being two months in Africa, finds this orderly show cause, misses the 30 days, they could easily request good cause or whatever for it. Oh, certainly. I'm sorry. I thought you were referring not to the 30 days for requesting the orderly show cause but the 30 days after the final order in which you have to petition for review from this court. I noticed the government took a long time to publish the final order here. Why is that? Well, I think that ordinarily the government waits in these instances to see if a request might be forthcoming, might be late. There certainly are circumstances in which under 21 CFR 130143E, the government can reopen a proceeding with good cause having been shown. Certainly neither the United States nor the Drug Enforcement Administration has any interest in rushing to render a judgment in a situation in which a request for a hearing has not been done. In fact, in this case, the government waited nearly nine months before rendering its final order. So to go back to your question, Judge Prager, certainly in the instance that somebody's away and they've received the order to show cause, they could explain the circumstances to the DEA and under the good cause exception, I'm quite certain that that would be allowed. That, of course, did not happen in this case. Why wouldn't that apply here? She hands it to a lawyer. He says, I'll take care of it, and apparently he didn't. Says he did, but there's no evidence that he did. Why isn't that good cause? Well, I don't think it's good cause because in similar situations, for example, the filing of the notice of appeal when you're talking about a jurisdictional requirement, which the 30 days under Section 877 is, then that cannot be waived. And, for example, if an individual's attorney does not file a notice of appeal within 30 days or within 60 days, if the government is a party, the mere fact that that attorney is negligent doesn't allow the court to expand the time. In this instance, it may have been a different story if when Dr. Fry requested to reopen the proceedings, there was some evidence offered as to the fact that this attorney had, in fact, requested a hearing. In fact, if you look at the excerpts of record, it merely is one line. This is to inform you that her previous attorney requested a hearing. Certainly, no copy of the hearing was provided, no return receipt, a fredal express invoice, or even the affidavit that subsequently was produced. And if I understand Mr. Leiter correctly, it's not altogether clear whether Dr. Fry believes that Mr. Nick did, in fact, request a hearing or not. Under those circumstances, the standard of review for denial of a request to reopen is whether the government or the agency engaged in the clearest abuse of discretion. And in the absence of any evidence or any justification for why the DEA never received a request for a hearing, I submit that this cannot be a situation in which the government engaged in the clearest abuse of discretion. Let me ask you a few questions about this reconsideration business for a moment. Is it the government's position that the DEA statutes that apply here give the DEA either the express authority or implied authority to reconsider a final decision? No. In fact, the regulations do not allow for a request to reopen. In fact, they provide that once a decision is issued, that decision is final. So then apart from, there's no statutory basis or regulatory basis for reopening. Does a federal agency always have the inherent sort of the authority to reconsider a final decision? I looked at that question long and hard, Your Honor, and the best answer I could come up with was the Supreme Court's decision in the Brotherhood of Locomotive Engineers case. Well, the statutes there seem to allow the agency to reconsider a final decision. That is true, and it's been read by other courts, including my understanding, this court and the Friends of Sierra Railroad case, to extend to situations in which the regulations do not expressly allow for a motion to reopen. I mean, I have to say I certainly would have made the argument that there was no possibility of even making a request to reopen if I thought that I could in good faith make that argument. And given the loss that's been put on the Brotherhood of Locomotive Engineers case, I did not feel that I could make that argument. So here, then, the government would concede, or does not argue otherwise, but we have jurisdiction solely to consider the denial of the reconsideration request. That's right. That's right. And then the standard review relevant to that determination is whether there is new evidence or new facts that have been presented, and then only if the government or the agency engaged in the clearest abuse of discretion. And I would submit that, again, in the absence of any proof, explanation whatsoever, as to why the DEA never received the request for a hearing in this case, this doesn't fall under that standard. How many of these do you get where, you know, doctors are involved or an OSC, but there's absolutely no response? I'm not aware of. There are, I would say, roughly 10 to 20 orders to show cause that are issued to doctors every year. I can't say how many involve a situation in which no response is received. But it is a situation that's contemplated by the implementing regulations, which both provide that if no request is received, then the DEA will treat the matter as conceded. Counsel, since you concede we have limited jurisdiction to consider this issue of reopening, could we remand this to the DEA, direct you to have a hearing to allow this lawyer to be interviewed? It's a very onerous situation we have with this doctor who operates in a rural community. I come from areas where you can't get a doctor to come, and it seems to me that there's a lot of public policy involved here. Under your gloss on locomotive engineers, can we do that? I think, Your Honor, Judge Beam, you certainly could do that. I don't think that under the relevant standard of review, I don't think that would be an appropriate decision because I think that you would have to find that the agency, again, engaged in the clearest abuse of discretion. We'd have to abuse our discretion to say that you'd abuse yours. I think that would be our position, yes. Well, you know, I'd really like to know how many of those 20 that are sent out a year just go by default. If Your Honor would like, I can get that information to the court and provide it by way of a letter brief. I don't see. I mean, it seems to me like he's got a valid excuse here. He did give it to this lawyer. He did say that he finally signed an affidavit that he did send the notice in. And, I mean, at the very least, he ought to have a hearing on it. I mean, what's the big deal about having a hearing? It's not like you're opening the floodgates because you only get about 20 of these a year. That's certainly right, Your Honor. It's not going to clog the government. I would point out, Your Honor, though, that the affidavit was never presented to the agency to begin with. The affidavit was executed on January 24th, a full week after the DEA denied the request to reopen, and two days after she had filed her petition for review in this court. And as this court has stated recently in the Lowry v. Barnhart case, evidence that was not presented to the agency is not part of the record on review. Now, I would concede that certainly one might say that if this court were reviewing the matter de novo, it might come to the conclusion that the administrator should have allowed a reopen the proceedings and allowed a hearing, but under the relevant standard of review in the absence of any evidence justifying or explaining the lack of a request for a hearing, it's not a clear abuse of discretion for the deputy administrator. You can only ask for one reconsideration. I'm sorry, Your Honor? You can only do this once? You can only ask for reopening once? I certainly have not suggested that, Your Honor. Then you can do it again. Well, that would be for Petitioner's Counsel to decide. Going back to you, I just want to go back to your question, just pious, about the reopening. I would go back to that point. I think that this is an area of the law in which there is not anything directly on point as to whether there is this authority in this case, and so we have to go with what we see as the best authority on that point. I would just want to add one final point. As to the original final order revoking the registration, this court does lack jurisdiction to entertain that aspect because, as we set forth in our brief, the 30-day limit is jurisdictional and the petition for review was not filed within 30 days. So in the absence of any other questions, or I'd be happy to answer any other questions, but we would respectfully ask the court to dismiss that aspect of the petition for review for wanted jurisdiction  Thank you. Thank you. Perhaps I'm missing something, but to me that's the oddest part of the government's argument. If the court rules that there's real question about whether Dr. Fry wanted a hearing at all and the administrator finds, well, indeed, she wanted a hearing, then she should get the darn hearing, you know? The counsel is correct that we're not supposed to consider material that wasn't before the administrator when they made their ruling. So you want us to go outside the record and find these things that you're arguing here. Maybe your best approach is to file a new motion to reopen this case. That's what I heard you concede you could do. It's supported with evidence that the court sections this to give you some relief. Specifically with the letter. Well, they interpret... Is there a time limit on the revocation? There's a 30-day time limit to ask for a hearing. I mean on the revoker or whatever the certificate. Does it last a year, two years, three years? No. A lifetime thing? Well, the way he wrote it is for any time she may apply for registration, it's to be denied. That's how he wrote it. It's not as though she could rehabilitate or anything like that. That's how it's written. But just to respond to your statement, there is the letter that states clearly that she did request a hearing. It may not have had all the evidence that we could have had, but there was that. And, frankly, if this person had an open mind, he would have said, what the heck, let's grant the hearing. You know, I'm fighting for this right really to a kangaroo court. You guys don't have much experience with these DEA administrative courts. I have had some. But at least you get a chance to counter the evidence. They don't just go through this. I don't know if you've ever worked in law enforcement and seen an investigative file. It's not something you would want to bet your children's health on. He said stop, so I'm stopping. Okay, you're following the rules precisely. Commendable. Well, how long does this revocation last? A lifetime? What the revocation does is it denies her registration and it further denied any pending requests for renewal. It doesn't last a lifetime. She can always file an additional or a new request for her registration. Given the circumstances, I have to be frank that I would not see it likely that it would be granted, but she could certainly present all of the evidence that she wanted to present at the previous administrative hearing in the request to have her license or her registration renewed. That's fine, though. She's fighting an uphill battle all the way. Undoubtedly, Your Honor. I certainly would concede that. Well, how many of those requests are granted every year? I don't know the answer to that, Your Honor. It would be interesting to know, wouldn't it? Got to be a public record someplace. If Your Honor would like, I can get that information. I wouldn't mind seeing it. Was the agency's ruling effective as soon as they filed the final order? It was dated December 13th. It becomes effective when it's published in the Federal Register, which occurred on December 20th. So from that time forward, she's not been able to issue any? That's right. That's right. Oh, I'm sorry. Let me correct that. For purposes of the 30-day period for filing a petition for review, it becomes final for purposes on December 20th. However, the order said that the effective date would be, I believe, January 21st, 2003. So she has not been able to prescribe or schedule two through five substances since that date. Okay. Well, how about penicillin? Did she prescribe that? I'm not aware. I wasn't aware of that circumstance. That's a new one to me. Okay, thanks. All right. The matter has been submitted. We'll call the next case. Grage versus Ashcroft. Good morning, Your Honors, and may it please the Court, my name is Randy Barnett. I represent Angel McCleary Raich and Diane Munson. I also want to acknowledge the presence in the courtroom this morning of Ms. Alice Mead, representing the Amicus Curiae California Medical Association. We're very grateful to her for her participation in this case, as we are all the amicus in this case. I will take 12 minutes to argue now, Your Honors, and then reserve eight minutes for rebuttal. This case involves wholly intrastate, completely non-economic activity undertaken to preserve the life and alleviate the suffering of Diane Munson and Angel Raich. And the constitutional question is, does Congress have the power to reach it? How could it be that Congress cannot prohibit the possession of guns near a school because that's non-economic? And Congress cannot prohibit violence against women because that's non-economic? Yet Congress can prohibit the wholly non-economic intrastate activity of growing and using medical cannabis to alleviate suffering and to preserve someone's life. Yet this unprincipled interpretation of the Supreme Court's Commerce Clause cases is the foundation of the government's case. Now, in our briefs, as you know, we've presented four reasons why the government lacks the power in this case. The first is based on it succeeding its power under the Commerce Clause. The second concerns interfering with the sovereignty of the State of California and thereby violating the Necessary and Proper Clause. The third concerns the violation of the fundamental rights of our clients. And then finally, we've added another claim based on the case of Lawrence v. Texas and the interference of liberty here. Now, I'm prepared to answer the Court's question on any of these. Before you address any or all of those, would you mind sort of informing me whether you were involved in the cases that were before the September panel? Yes, I was, Your Honor. I argued. How did this case fit within those cases? This case, Your Honor, involves the wholly personal cultivation and use of medical cannabis, done either by the individual herself in the case of Diane Monson or in the case of Angel Raich, involving two caregivers who are doing this on her behalf because she cannot do it herself. The other cases involve cooperatives or organizations that have been organized pursuant to California state law to provide medical cannabis for people under California state law. And that has raised different issues with respect to the Commerce Clause. Did you raise similar Commerce Clause issues? Yes, we did raise the same Commerce Clause issues there. But what makes this case different is really where I was going to open anywhere, and that is that what we deal with here is completely non-economic behavior, unquestionably non-economic behavior. And if the Supreme Court's opinions in Lopez and Morrison stand for anything, it's that non-economic behavior is outside the substantial effects doctrine of Wickard v. Filburn. Let me ask you this. Would this be a correct statement of the right that's at issue here? You want to listen to me? Yes. Okay. We're talking about the right of seriously ill patients who have no other effective treatment to be free of federal prohibitions on their cultivation, possession, and use of marijuana for medicinal purposes on the recommendation of a physician or permitted by state law. Your Honor, I would not put the right, even though I agree that that is included within the right that we're inserting, I believe the right is more general. The fundamental right... No, I'm talking about the Commerce Clause issue. Oh, I'm sorry. I was... That's what we're talking about. Okay. We don't need to get into the fundamental right business. I mean, there's a lot of rights that we'd like to see fundamental, like the right to a decent education. It's not considered a fundamental right, is it? There isn't, but there is a fundamental right to life and to avoid pain and suffering, Your Honor, that has a long-standing tradition in the history of our country. And the government's actions are infringing upon that right. But I misunderstood Your Honor's question. I did listen very carefully as you described the right, but if what Your Honor is... Should I read it to you again? I heard it. But if what Your Honor is describing is the activity or the class of activities that the government seeks to reach, I believe that's an accurate... I'm talking about the Commerce Clause issue. Right. What Your Honor has described is the class of activities that the government seeks to reach, which we contend are wholly non-economic and completely outside of its commerce powers to reach. And if it had crafted a statute which attempted to prohibit just the activities and only the activities that Your Honor just described, it would be unconstitutional, be clearly unconstitutional. In fact, I believe the government would concede that it would be unconstitutional, just as prohibiting guns within a thousand feet of a school is unconstitutional, just as creating a civil cause of action for violence against women is unconstitutional. The only justification that the government can offer to reach this class, which it cannot reach directly, is to define a class... It's a violation of the Commerce Clause. That's what you're talking about. I'm saying that to reach that class of activities, it's outside. It exceeds their power under the Commerce Clause. Under the Commerce Clause. Right. And the only... Yes, Your Honor. Go ahead and finish. The only way that they can reach this class is by defining a class that's large enough to include some activities that are within its powers and then also include these activities which are outside its powers. And if it is allowed to do that, in order to reach a class of activities that it otherwise cannot reach, then it can reach every activity in the entire United States, whether economic or non-economic,  the Congress lacks a general plenary police power. The Constitution doesn't give it to it. It doesn't have it. But if you accept the government's argument here, there is just no stopping point. The Congress has that power. Not only Congress... Can I ask her a question? Yes, I would. I know you've got a speech inside of you. It's dying to come out, Your Honor. Well, I really have a couple of questions. First, going back to Judge Preggerson's recitation of the class, what is added to the substance of that by the approval or disapproval of the state? Are you saying that the police power of the state is broader than Congress's power to enact a prohibition like this under the Commerce Clause? It seems to me that adding the state's approval doesn't add to or take away from anything. And my second point is, however broad or narrow you make the class here, it boils down to whether this marijuana is an economic activity. Right? Well, answering your first question first, contrary to anything we may have suggested in our briefs, I will accept Your Honor's characterization. It doesn't matter, for purposes of our Commerce Clause argument, whether or not the state has or has not approved this use. That is only relevant to our second state sovereignty argument. And if there's any suggestion in our briefs to the contrary, and there may be, I want to disavow that suggestion. I believe that Judge Fogle was right when he decided the Santa Cruz case in saying that is a false issue. The key is whether Congress has the power to reach this class of activities regardless of what the states have done. I agree with that. Now, your second question. Well, if these activities are economic activities, then Rikard v. Filburn, does Jan say that? Well, no, it doesn't, Your Honor. First of all, obviously, I strongly argue that these are non-economic activities. But even if they are economic activities, what the Supreme Court, what Rikard itself says, and how the Supreme Court interpreted Rikard in both Lopez and Morrison, is that at that point, you have to aggregate that class of activities to determine whether that class of activities has a substantial effect on interstate commerce. There's been no findings by anyone on that, either by Congress or by any court, and there's been no hearing on that. And so that would just be the threshold question. And to get back to Judge Paya's question, that is one of the issues that's at issue in the OCBC case. The aggregation principle might apply to any arguably economic activity that's existing in that case, which is absent in this case. And in that case, we are asking for a hearing if the court finds that this is economic activity at all, or at least a finding, or at least an argument as to why, or make the government show why it has a substantial effect on interstate commerce. This is not that case, Your Honor. But if one grain of wheat fed to Mr. Filburn's livestock on his farm in central Ohio, not even close to the borders of Ohio, is economic activity for the purposes of acreage restrictions, USDA's mid-30s approach to things, I'm having difficulty in seeing how these four marijuana plants, and especially those that are grown by Bill Warren, are not economic activity under the Supreme Court's jurisprudence. Because the question is whether Mr. Filburn was engaged in economic activity and having a farm. His farm was economic activity. In a way, my client's conduct is clearly not economic activity. Mr. Filburn was engaged in commerce, Your Honor. If Mr. Filburn had only been growing, if he was living in Lincoln, and he had a plot of wheat behind his house, that statute would not have applied to him. And Wickard v. Filburn tells us nothing about how that non-economic activity would be treated. But in fact, he was engaged in the commercial activity of farming. Now, it's true. Some of his produce was consumed on his farm. Others of his produce was sold interstate. And what the court held was that the Congress had to be able to reach the produce that was grown and consumed on his farm in order to make coherent and make it possible for them to regulate the interstate price of wheat, which is what their legitimate object was in that case. For broadening the facts a little, he sold it to the local co-op, which was five or six miles from his farm in Ohio. The Supreme Court said it was sold interstate. Mr. Filburn didn't. But there's no question that Mr. Filburn was engaged in the commercial activity of farming. That's the key. I mean, that is really, I'm glad Your Honor raised it, because as soon as you can tell the difference between a commercial activity of farming, whether it's intrastate or interstate, you're on the commercial side of the line. But if there is a line between commercial and non-commercial, our clients are on the non-commercial side of the line. I agree that drawing any line is not always easy, but there is a non-commercial side of the line, and growing plants in your own home to consume as medicine for yourself is on the non-commercial side of the line, just as cooking food in your own home to keep yourself alive through nourishment is on the non-commercial side of the line. We wouldn't confuse that with a mom-and-pop grocery store or mom-and-pop restaurant that doesn't do business in interstate commerce. This is my last. Growing wheat on a farm is an economic activity. Growing medicine in your backyard isn't. It could be. It might be. In this case, it's not. And we're only seeking an injunction with respect to clearly non-economic activity. If we were involved in economic activity, that would put us more over into some aspects of the OCBC case and would not be the case that we have before us. I said I would reserve eight minutes of my time for rebuttal, but I'm prepared. Here are your clients. One of them just planted their own seeds. And the other, someone else did it for them. Because she can't do it for herself. She can't do it herself. Right. And whatever was grown was used right there on the premises. By her. By her. And not only her. And nobody else. Exactly. It's only intended to be used by her.  Where did you get the seeds? The seeds were acquired wholly within the state of California. Everything that was used was acquired within the state of California. Your Honor, I reserve the balance of my time. Let me ask you this. I mean, hemp comes in pigeon feed. Is that right? I wouldn't know, Your Honor. Same? That hemp is included in pigeon feed? It was when I was growing up. In Calumet City, Illinois, we didn't learn about pigeon feed or hemp where I grew up. Well, I just wondered whether the hemp that was in the pigeon feed was the same kind of hemp that's involved here. I'll bet you that's something Mr. Quinlivan would know. He works for the Department of Justice. He's interested in enforcing all these drug laws. I'll bet you he'd know the answer to that. All right. Okay. Made the homing pigeons fly straight. Thank you, Your Honor. May it please the Court, Mark Quinlivan again on behalf of the United States in this case. Let me begin Judge Pius's question about the September hearing. From our perspective, every issue in this case was covered in that September hearing with one exception, and that is the Rach Appellant's contention that there is a medical necessity defense that still is available to them under the Supreme Court's decision in Oakland Cannabis for personal possession. With respect to each of the other issues, they were presented in the other case, and I would point out that one of the plaintiffs in that case was an individual who not only was a member of a cooperative, but alleged that she was growing marijuana for her personal use and that she had a private garden for her personal use. So that very issue was presented. Which case was that? There were several cases. That's right. That was the Woman's Alliance v. United States, and the plaintiff's name was Valerie Corral. Valerie what? Valerie Corral. C-O-R-R-A-L. Corral? Yes. Where did she get the seeds or the slips that she used? Well, we don't know, Your Honor, and I think that that goes to show that the attempt here to basically get from around 25 years of this Court's precedence upholding the Controlled Substances Act against Commerce Clause Challenge is doomed to failure. Yes, but all these Commerce Clause Challenges, they just arose in the past few years. No. Actually, Your Honor, this Court for the very... I mean, the Supreme Court has narrowed the reach of the Commerce Clause. That's certainly true, Your Honor, but after the Supreme Court's first decision in Lopez in the sort of new federalism decisions, this Court reaffirmed its decisions upholding the Controlled Substances Act and its decisions in United States v. Kim, United States v. Tysor, and United States v. Bramble. But was there a case on all fours with the narrow issue we have here? There was not. There was no purposes or doctor's recommendation, and they grow the marijuana themselves, or if they can't, they have a caregiver help them. There was not that specific question presented, but there were analogous. In particular, I point to, and what the very able district judge in this case pointed to, was this Court's decision in United States v. Visman. Well, he's able if you like what they do. Well, that's certainly true, Your Honor. But in Visman, which predated Lopez but was expressly reaffirmed in Kim, in Visman, this Court confronted the question of whether marijuana plants rooted in the soil could be subject to Congress's Commerce Clause authority. And as the Court noted in that case, there was no obvious interstate connection because those marijuana plants were rooted in the soil in this individual's backyard. And this Court nonetheless held that because the Controlled Substances Act covers a broad class of activities and that Congress has made express findings as to why both interstate and intrastate traffic and controlled substances affects interstate commerce, it fell within Congress's Commerce Clause authority. And I would point out... Well, how about the medicinal use? Well, I don't think the medicinal use adds anything to the analysis, and I think that actually the Supreme Court's decision in Oakland at cannabis, that the reasoning of that decision disposes of that claim because what the Court said was that this Controlled Substances Act allows for no medical necessity exception and indeed precludes consideration of that evidence. Now, by parity of reasoning, if the Act precludes consideration of that evidence for purposes of a common law defense, I don't see how one can then cabin the class of activities for purposes of Commerce Clause analysis by reference to something that Congress didn't decide and indeed, as the Supreme Court suggested, is precluded from consideration under the Controlled Substances Act. This ultimately goes back to the Supreme Court's decision in the Perez case, which the district court relied on, that Congress can regulate an entire class of activities and in those instances, so long as it is active within its authority, you cannot excise trivial individual instances of the class. Let me ask you this. Now, the district court didn't have the benefit of our decision in McCoy. That's right, Your Honor. What's your take on McCoy? Does it relate to the plaintiff's argument? I don't think McCoy helps them at all. Well, there we used an as-applied argument. That's certainly right, but in footnote 24 of that opinion, this Court expressly distinguished the statute at issue there from the Controlled Substances Act, noting that in contrast to that child pornography statute, Congress had made express legislative findings in the Act linking intrastate to interstate commerce and that it was on that basis we had repeatedly up... or the Court had repeatedly upheld the Act, citing to Vitzman, Tysor, and Kim. So following this Court's ordinary course, which is that it will not reverse its precedent unless a case is close on point, and that certainly is not a case that can be held or said to be close on point, given that the McCoy Court expressly distinguished the Controlled Substances Act from the statute at issue there. And I don't... It utilized an as-applied analysis to a commerce clause challenge. It certainly did, Your Honor, but again, it went... I go back to the point the Court emphasized that there were no legislative findings that linked interstate to interstate and interstate commerce. It also distinguished the statute, the carjacking statute at issue in this Court's decision in the United States v. Cortez, again noting that there were express legislative findings in that instance and those were absent with respect to the statute at issue in McCoy. And Judge Fogel... We submitted a Rule 28J letter noting Judge Fogel's recent decision in the County of Santa Cruz case. Judge Fogel has engaged in that analysis and he came to the conclusion that McCoy does not allow for an as-applied challenge with respect to the Controlled Substances Act. And that is what, fundamentally, what the bridge appellants are asking this Court to do here. Yeah, but the core of their argument is that commerce is not involved here. And I would submit that that... First, that that contention doesn't hold water. First, I would start... They're not selling this. They're using it for their own benefit. Well, we start... Personal use. Well, that certainly is what they allege. But we start... They're not selling it. You're not contending they're selling it. We're not contending that, nor do we think we need to show that for purposes of the Commerce Clause analysis. We go back to the point that the courts don't look at individual instances of the class. You look at the class that is regulated by Congress. And this Court has repeatedly held that drug transactions are economic activity that affect interstate commerce. In fact, that became readily apparent during the September hearing, during which time there were three clubs which distributed marijuana on a wide-scale basis for cash. And even the bridge appellant's recent Rule 28J letter notes that the Women's Alliance had a staff, received monetary donations, so there clearly was economic activity going on there. Now, I understand the rage appellants here try to then cabin the class even further to deal with the particular appellants before this Court. But we go back to what this Court has held and what the Supreme Court said in Perez, that you cannot excise trivial individual instances of the class. You look at the class of activities that Congress has regulated. Nor can you, for that matter, define a new class by aggregating the trivial instances of the class, which I submit is what they're trying to do here. If the defendant in the Visman case, his growing of marijuana plants rooted in the soil can be held to affect interstate commerce, as this Court has held, then it cannot be the case that an entire class of people who are allegedly using marijuana solely for medicinal uses within the boundaries of California, that that entire class doesn't fall within Congress's Commerce Clause authority. I would also just note Judge Paez's question. We don't know where the seeds came from. We don't know where the growing equipment came from. That came from the rooted in the ground. They were intended for sale. They were? That's right. It was a charge of cultivation with the intent to distribute. In a subsequent case, United States v. Bramble, this Court upheld Congress's Commerce Clause authority in a case involving solely cultivation and possession. There was not a charge of distribution and there was not a charge of possession with the intent to distribute. And this Court, relying on Tysore and Kim, held that that fell within Congress's Commerce Clause authority. Indeed, every court of appeals to have considered this question has held that even intrastate instances of traffic-controlled substances affects interstate commerce. And every court to have considered this question following the Supreme Court's decision in Morrison, including the Fourth, the Eighth, and the Tenth Circuits, as well as the district court here in Judge Fogel in the county of Santa Cruz, has found that Morrison does not call into question this Court's authority as well. And, indeed, Morrison says that courts don't blindly defer to congressional findings. And that certainly is true. But in its very first case upholding the Controlled Substances Act against the Commerce Clause challenge, this Court and Rodriguez-Camacho recognized that it didn't need to defer to Congress's finding if the relation between intrastate and interstate commerce was nonexistent, but held that such is not the case with controlled substances. Congress had a rational basis for making its findings. So this Court has already answered the question that was presented in Morrison whether there is a rational basis or too much of an attenuation between the class of activities in question. Let me turn to the Tenth Amendment challenge. The conclusion that the Controlled Substances Act is a lawful exercise of congressional authority under the Commerce Clause necessarily disposes of the Tenth Amendment challenge. I think the Supreme Court's decision in the Virginia surface mining case makes that clear. And, indeed, this Court in Kim and in United States v. Rosenberg has expressly rejected the notion that the Controlled Substances Act interferes with the sovereignty of the states. This Court's decision in the Carnahan case forecloses the fundamental rights argument advanced by the Raich appellants. In that case, this Court held that rights of personal liberty and privacy... Well, they never argued these issues in their argument. They didn't get to all that, did they? They didn't, but I'd be happy to limit myself. No, I just... But I won't have a chance for rebuttal, Your Honor, so I wanted to at least cover the issues. The panel in Carnahan, though, didn't address these issues squarely. I think it did, Your Honor. Certainly, with respect to Ms. Raich, it did, because Ms. Raich is not cultivating marijuana on her own. She has the two joint... But, you know, our older case is dealing with Laetrelle. What was it, Carnahan? Carnahan, that's right. The panel there didn't deal with the fundamental rights question. Oh, it certainly did. Not directly, it didn't. I... Judge Paz, I was just... I think the Eighth Circuit did in that other case. It was the Tenth Circuit in Rutherford. But, no, in fact, the court expressly held that while we need not decide whether home remedies of one's own confection, one has a fundamental right, personal rights of liberty and privacy do not entitle anyone to obtain Laetrelle free of the exercise of the government's police power. And, indeed, every court that has considered the question subsequently has read Carnahan as foreclosing that fundamental rights argument. The district court here did. Judge Fogle in the County of Santa Cruz case. Judge Breyer in the Cannabis Cultivators Club cases. Cases from other districts. We cited in one of our footnotes a Smith v. Shalala case from the District of Columbia. That involved antineoplastins as a treatment for cancer. And the claim there was that one had a fundamental right to use whatever treatment one could to preserve one's life. And Judge Robertson of the District of Columbia, relying on Carnahan, held that that issue was foreclosed. I'll just close briefly with the medical necessity argument and then the consideration of the other equitable factors. On medical necessity, the Supreme Court made clear in footnote 7 of its opinion that, and I quote, "...lest there be any confusion, we clarify that nothing in our analysis or the statute suggests that a distinction should be drawn between the prohibitions on manufacturing and distributing and the other prohibitions in the Controlled Substances Act." That does not allow the claim that one can have a medical necessity for personal use of marijuana. And finally, as to the equitable factors, the Rachel Pellants spent a significant amount of time focusing on the public interest. And what the Supreme Court made clear in Oakland Cannabis is that one cannot consider anything when looking at the public interest in resolving an injunctive action. And indeed, where a statute has clearly indicated Congress's decision as to the public interest, a court cannot digress from that consideration and, in particular, cannot consider the alleged medicinal uses of marijuana as a consideration in the public interest. Judge Jenkins considered all these questions, correctly determined that while this undoubtedly has proven to be a controversial issue as a matter of public policy, resolution of the legal issues in this case involves a straightforward application of Supreme Court and this Court's precedence. For these reasons, we respectfully ask that the Court affirm the judgment of the District Court. You know, I read in the science section of the Los Angeles Times or the New York Times that I believe it's in Germany where scientists are conducting studies on cannabis and they're developing a drug that will have the benefit of suppressing pain and that doesn't have with it the negative reactions. Did you see that? I did see that, Your Honor. It's consistent. There already is one pill called Marinol which has one of the active ingredients of marijuana which is now in Schedule 8, the treatment of nausea in cancer in AIDS patients. The DEA and the FDA have approved several studies that are ongoing here in California as to marijuana's medicinal value and the Controlled Substances Act itself allows a procedure whereby when changes in medical and scientific knowledge occur, one can petition the DEA or the DEA can start an investigation on whether the changes in medical technology or the changes in medical evidence warrant a rescheduling of marijuana or any other drug. That has not occurred to date with respect to marijuana. In 1992, the DEA administrator denied a petition for rescheduling for marijuana and that was affirmed by the D.C. Circuit most recently just two years ago in 2001. A petition was referred to the FDA for its analysis and then Surgeon General David Satcher recommended that marijuana remain in Schedule 1 because the evidence or the current evidence did not support the conclusion that it had an accepted medical use in the United States. That's not to say that there may not be the development of drugs that isolate the cannabinoids in marijuana and have a different delivery system than smoking. I was just mentioning something you may not have been because you were an expert. Well, I had a few extra minutes, Your Honor, so I wanted to take advantage. In fact, the Institutes of Medicine had a study on this issue that was published a few years back and one of the conclusions they reached was that while there is no future in smoked marijuana as medicine, there may be the isolation of individual cannabinoids and a different delivery system than smoking and that that may have future scientific benefit. But that, of course, those would be different drugs than marijuana and just as every other drug has to go through the FDA approval process to be approved in the United States, marijuana has not met that test. On a different topic, just as a matter of information, do you know if the government has decided to petition for SIRT in McCoy? I don't know that. In fact, I believe that the time may have already passed. I don't know the answer to that question. I'm sorry, Your Honor. Thank you very much. Appreciate it. Your Honors, I really do want to get to the cases that counsel has relied upon, but before I do, since this last discussion of the reasonableness of the Controlled Substance Act, I think is belied by the information that's already been provided to the Court by the amicus brief and I won't say any more about it. I think that those facts speak for themselves as to how reasonable the application of the statute has been and also the active ingredients that Mr. Quinlevan has touted for future medical benefits are currently available to our clients in the form of the medicinal cannabis that they're currently consuming and subject to pain of punishment and incarceration and it's the government that's stopping these from being delivered to them in a more efficacious manner. I do want to talk a bit about the cases that counsel has relied upon as they relied upon in our brief and we do deal with these in our briefs but I would just emphasize that all the Ninth Circuit cases that counsel relies on either involve commercial transactions in some way or another as Judge Pragerson pointed out or even in the case of the Bramble case is a pre-Morrison case. All the interpretations of Lopez that took place before the Morrison case was decided are highly suspect because what courts across the country did was basically interpret Lopez as saying there were no findings in Lopez. As soon as Congress has findings, we'll divert the findings and that does away with the Lopez problem. What Morrison taught us is that that's not true and what the Ninth Circuit in U.S. v. McCoy has done is taken Morrison seriously and I think that that's an opinion that deserves to be taken seriously. I have to say that the Ninth Circuit has taken Morrison seriously but by taking it seriously, we'll now find out whether the Supreme Court will also take it seriously as applying to situations involving, for example, the suffering of people with respect to medical cannabis as it formerly applied to violence against women and guns within a thousand feet of a school. But I think that that decision is entitled to be taken seriously as Judge Reinhart, writing for the court in the Ninth Circuit, did take seriously in the Morrison case and I would also say, I mean in the McCoy case, and I would also say about the McCoy case is it did not distinguish the Controlled Substance Act. It simply said it wasn't deciding the Controlled Substance Act case. It was not a case before it and in fact, as you know from the briefings in this case, the Controlled Substance Act contains lots of other factors that might not have been present there. Your case is really a McCoy case, right? It is a McCoy case. It's an as-applied McCoy case. Our briefs discuss McCoy at great length for good reason. This is an as-applied to a completely non-commercial class of activities case and the argument the government makes, in fact, it's the only argument, I want to focus on this, it's the only argument the government makes is that Congress can reach this class of activities if it's willing to go after a much larger class of activities of which this non-commercial wholly interest state class is a part. That's their whole argument. That means that Lopez is irrelevant and Morrison is irrelevant because all Congress has to do to fix things is just go after more interest state activities. And if it goes after more interest state activities, it's constitutional. That can't be right. It can't be right that Congress has more power to reach inside a state and go beyond its interstate commerce power under the Necessary and Proper Clause. The more activities it tries to regulate, that would basically give it a plenary power over all commerce. And I would like to know, I asked before whether the government would accept the implications of this argument, which is that Congress can regulate any activity in the country provided they're willing to go after a big enough class of activities of which this activity is a part. I would also like to mention the Carnahan case. The Carnahan case did not dispose of this. It did not deal with this issue. For one thing, it did not deal with the due process challenge. It said the due process challenge was premature. And secondly, it specifically did not decide whether somebody had a remedy of their own confession. This is a case involving remedies of their own confession. As Mr. Quinlevan, I think, conceded with respect to one of the clients here. We believe it's true with respect to both clients, Your Honor, but I believe I heard a concession by Mr. Quinlevan that one of these clients was using remedies of her own confession, which take this case outside of the four corners of Carnahan, outside of Carnahan altogether. I would also point out, Your Honor, that Maranol is not a drug that can be it only contains one of the cannabinoids of cannabis, and it is not effective with respect to our clients. If our clients could alleviate their suffering through the use of this legal, available, prescribed drug, I assure you that they would. They would not be in federal court if that drug worked. It doesn't work. The only thing that works for them is this, and the only thing that stops them from consuming the drug that is saving their life and preventing suffering is the interference of the federal government. Finally, I would address the issue of the difference between the OCBC case and this case. I would just bring us back to that once again. The OCBC case and the other cases, the WAM case and the other cases that were heard in September, include the facts of this case, but they also include other facts that the government has argued renders the activities in their commerce basically money-changing hands. In OCBC, you have money. It's being given to a member of a cooperative. It's being contributed by members of a cooperative in return for which they get cannabis. This, the government contends, is commercial activity, and therefore we argue an OCBC must still be subject to the substantial effects test of Morrison and Wicker. Here, we have no money-changing hands. We have no commercial activity, and for that reason, this presents a clean case. Counsel said there was one case in the September group of cases, or one plaintiff in those cases. Those cases include lots of activities, some of which the government argues are commercial, others of which I guess today they're conceding are not commercial. I don't think they really did. That's not fair to the government. They didn't concede it's not commercial. They're claiming the activity that took place here is commercial, and that's absurd, but that's the length, I'm afraid, to which the government's argument has to go in order to justify being able to reach into somebody's home and deprive them of four plants that they're growing to preserve their own life. Your Honor, my time has elapsed, and I thank Your Honor for your close attention. Thank you. Thank you. And the matter will stand submitted. Now that we've heard this batch of cases, we'll take a recess. I'm going to need to do this stuff first. ...
judges: Pregerson, Beam, Paez